RESERVE INSURANCE COMPANY, Plaintiff-Appellee, v. GENERAL INSURANCE COMPANY OF AMERICA, Defendant-Appellant.— (CONTINENTAL CASUALTY COMPANY, Defendant-Appellee.)

First District (2nd Division)   No. 78-798

Opinion filed September 18, 1979.—Modified on denial of rehearing November 6, 1979.

William J. Harte, Ltd., and Kralovec, Sweeney, Marquard & Doyle, both of Chicago (William J. Harte and Henry J. Marquard, of counsel), for appellant.

Schiff, Hardin & Waite, of Chicago (James B. O'Shaughnessy, Aaron J. Kramer, and William J. Van Susteren, of counsel), for appellee Reserve Insurance Company.

Edward J. Kionka, of Columbia, and Gilmartin, Wisner and Hallenbeck, Ltd., of Chicago (Edward J. Kionka and Richard S. Wisner, of counsel), for appellee Continental Casualty Company.

Mr. JUSTICE DOWNING delivered the opinion of the court:

This appeal arises out of plaintiff Reserve Insurance Company's (Reserve) suit against defendants General Insurance Company of America (General) and Continental Casualty Company (Continental) to recover damages for losses sustained as a result of certain alleged dishonest acts of Harry O'Brien (O'Brien), the manager of Reserve's bond department. General and Continental had issued successive Insurance Companies Blanket Bonds, Standard Form No. 25 (fidelity bonds), to Reserve which provided indemnity

> "* * * from and against any losses sustained by the Insured subsequent to noon of the date hereof and while this bond is in force, * * *, and discovered by the Insured subsequent to noon of the date hereof and prior to the expiration of twelve months after the termination of this bond * * *.
>
> (A) Any loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, * * *."

General's bond terminated as of noon of April 23, 1968, and Continental's became effective soon thereafter.

The dishonest acts, alleged by Reserve, consisted of O'Brien's execution of four construction bonds to Concrete Construction Services, Inc. (CCSI), contrary to specific instructions from Reserve's officers. Three of these bonds were issued during the term of General's fidelity bond: (1) the Cathedral bond on October 12, 1967; (2) the Wierton bond on January 8, 1968, and (3) the Cascade bond on February 27, 1968. The last bond issued by O'Brien, the Clarksburg bond, was issued on June 18, 1968, during the term of Continental's fidelity bond. CCSI defaulted on these bonds sometime after April 23, 1968.

The first claims on the CCSI bonds reached Reserve's management on December 5, 1968. General was notified on December 10, 1968, and on December 11, 1968, was requested to attend a meeting with Reserve to develop a plan whereby their respective exposures would be held to a minimum. General did not attend this meeting. From January 1969 through November 1970, Reserve paid out a total of $664,919.59 to settle the claims arising out of CCSI's defaults on the projects bonded by Reserve's employee. On May 20, 1969, General sent Reserve a letter denying coverage under its fidelity bond. On June 29, 1970, Reserve filed its complaint in the circuit court of Cook County against General and Continental (70 L 9179). This suit was dismissed for want of prosecution

on June 30, 1975. On February 17, 1976, the plaintiff's motion to vacate the judgment of dismissal was granted and the case was restored to the trial calendar. In June 1977, Reserve refiled its complaint (77 L 4858).

Each of the defendants moved for summary judgment, Continental arguing that the loss was sustained when the bonds were issued by O'Brien, and General asserting that a loss was not sustained until CCSI's default on the construction bonds. The trial court granted Continental's motion, and denied General's, finding that General was liable for the losses related to the first three bonds and Continental was liable on the fourth, assuming liability was in fact established. Reserve and Continental settled on the fourth bond and Continental[1] was dismissed from the suit. Reserve and General proceeded to trial. Following a jury verdict in favor of Reserve for $664,919.59, the trial judge awarded Reserve prejudgment interest from the date of each payment it had made on the bond claims in the amount of $245,806.94. General appeals contending (1) that its fidelity bond had terminated before Reserve suffered any losses; (2) that the trial court erred in awarding prejudgment interest; and (3) that the trial court erred in certain evidentiary rulings and in refusing one of the defendant's instructions.

## I.

Defendant General first contends that its fidelity bond is unambiguous and that there are four prerequisites to recovery under it: (1) actual loss within the bond term which (2) results from dishonest acts (3) committed within the term and (4) discovered within 12 months after the bond expired. Although General concedes that the dishonest acts were committed within the term of its bond, it claims that the commission of the dishonest act is a concept entirely dissimilar to a loss sustained; that the policy covers only losses sustained; and that Reserve did not suffer any losses when the acts were committed. The defendant advances three lines of cases to support its argument that the bond should be construed so that the time of Reserve's losses falls beyond the term of its bond. The first line of cases holds, according to the defendant, that losses are not sustained until a claim or judgment is actually paid. (*Cary v. National Surety Co.* (1933), 190 Minn. 185, 251 N.W. 123; *State Bank of New Prague v. American Surety Co.* (1939), 206 Minn. 137, 288 N.W. 7; *First State Bank v. Standard Acc. Ins. Co.* (5th Cir. 1938), 94 F. 2d 726; *Ronnau v. Caravan International Corp.* (1970), 205 Kan. 154, 468 P. 2d 118; *Foxley Cattle Co. v. Bank of Mead* (1976), 196 Neb. 587, 244 N.W.2d 205.) The second line of cases assertedly holds that losses are not sustained until the claim or

---

[1] Although the issues on appeal involve the judgment entered against General, a brief was filed by Continental on the theory that its bond did not cover plaintiff's losses resulting from the action of O'Brien committed prior to the effective date of Continental's bond.

liability accrues. (*Ocean Accident & Guarantee Corp. v. Old Nat. Bank* (6th Cir. 1925), 4 F. 2d 753; *National City Bank v. National Security Co.* (6th Cir. 1932), 58 F. 2d 7; *Hooker v. New Amsterdam Casualty Co.* (W.D.Ky. 1940), 33 F. Supp. 672; *Mount Vernon Bank & Trust Co. v. Aetna Casualty & Surety Co.* (E.D. Va. 1963), 224 F. Supp. 666; *Fidelity Savings & Loan Association v. Republic Insurance Co.* (9th Cir. 1975), 513 F.2d 954; *Jefferson Bank & Trust Co. v. Central Surety & Insurance Corp.* (Mo. 1966), 408 S.W.2d 825.) The third, or the Illinois view, assertedly holds that a loss is sustained when the claim is reduced to judgment. *People ex rel. Nelson v. Citizens Trust & Savings Bank* (1933), 273 Ill. App. 128; *National Slovak Society of the United States of America v. Matlocha* (1940), 307 Ill. App. 41, 29 N.E.2d 946; *Hinchcliff v. Insurance Co. of North America* (1934), 277 Ill. App. 109; *Otter Creek Lumber Co. v. McElwee* (1890), 37 Ill. App. 285.

The cases relied on by the defendant (1) considered notice provisions when losses were discovered rather than when the losses were sustained (see *National City Bank*; *Jefferson*; *Mount Vernon*; *Cary*; *State Bank of New Prague*); (2) determined that the bonds in question were not third-party beneficiary contracts intended to cover the losses of the third-party plaintiffs (*Ronnau*; *Foxley Cattle Co.*); (3) considered the time when the insured could claim indemnity from its insurer for covered losses under a hold harmless clause (*People ex rel. Nelson*); (4) considered when an agent's cause of action accrues against its principal for the breach of a sales contract (*Otter Creek*); (5) considered the admissibility of evidence pertaining to the employee's alleged dishonest acts to ascertain that loss or damage had definitely been sustained (*National Slovak Society*); (6) in a garnishment proceeding, considered a "no action" clause whereby the defendant was obliged to indemnify the insured for its liability as a carrier "only to the amount which they are obliged to pay and do pay" (*Hinchcliff* at 120); (7) determined that the insured had suffered no loss at all because it failed to prove that its employee had acted dishonestly (*First State Bank*); (8) considered whether a loss could be sustained by a voluntary payment without an adjudication of liability (*Ocean Accident & Guarantee Corporation*); and (9) determined that no funds at all had been diverted from the plaintiff bank by its employee (*Calistoga National Bank v. Fidelity & Deposit Co.* (1935), 5 Cal. App. 2d 248, 42 P. 2d 1051). In *Fitchburg Sav. Bank v. Massachusetts Bonding & Ins. Co.* (1931), 274 Mass. 135, 174 N.E. 324, the court rejected the defendant's claim that the plaintiff had not suffered a loss until it exhausted all its remedies against its dishonest employee and held that the loss occurred on the dates the employee diverted its funds. The court in *Imperial Insurance, Inc. v. Employers' Liability Assurance Corp.* (D.C. Cir. 1970), 442 F. 2d 1197, considered whether the payments the plaintiff made to third parties fell

within the type of losses, *i.e.*, "Loss of Money, Securities and other property," covered by the bond. Finally, in *Auto Truck Steel Body Co. v. Chicago Bonding & Insurance Co.* (1920), 218 Ill. App. 230, the court awarded the plaintiff its full pecuniary loss less the sum of $19.31. In excluding the sum of $19.31, the court found that this loss had occurred during the time the defendant's renewal bond was in force and that the bond had been issued in reliance on the plaintiff's false representations as to its employee's honesty during the term of the original bond.

We do not find the foregoing cases supportive of the defendant's construction of its fidelity bond. On the contrary, *Hooker, Fidelity Savings & Loan Association, State Bank of New Prague,* and *Cary,* support the plaintiff's position.

In *Hooker,* the court interpreted a banker's blanket bond that indemnified the insured "against any loss of money, * * * sustained * * * through any dishonest act of any of the Employees." The defendant in *Hooker* raised the same argument that defendant relies on here. The court said:

> "Defendant's contention that the loss was not sustained while the bond was in effect, because the actual payment was not made until after the bond expired is too technical to receive much consideration. *The dishonest acts causing the ultimate payment of the liability took place while the bond was in effect. The liability was incurred at that time; the loss, when paid, relates back to the date of liability.*" (Emphasis added.) *Hooker,* 33 F. Supp. 672, 673-74.

In *Fidelity Savings & Loan Association,* defendant Republic had issued a fidelity bond covering "losses sustained by the Insured at any time but discovered during the bond period." While the bond was in force, Fidelity merged with another savings and loan association, Trans-Bay Federal, and assumed its liabilities. These liabilities included unliquidated claims based upon fraudulent acts by Trans-Bay employees which were committed at times before the merger. The plaintiff defended the Trans-Bay lawsuits and sued the bonding company to recover its litigation expenses. The court viewed the question as whether any claim against Trans-Bay, if established, would constitute a loss sustained by Fidelity. The court held that the losses occurred prior to the merger and therefore were not covered by the bond, stating:

> "Case law interpreting the notice provision of the banker's blanket bond supports the view that 'the word "loss" refers to a condition in which the insured would be subjected to a claim or demand "out of which a legal liability might arise," and not to an adjudicated liability.' [Citations.] *Thus, the 'loss' occurs at the time of the activity giving rise to the claim against the insured* and not at the

time of trial proceedings or entrance of judgment." (Emphasis added.) *Fidelity*, 513 F.2d 954, 956.

In *State Bank of New Prague*, the plaintiff alleged that on April 1, 1933, one Conners deposited $800 in his account with the plaintiff bank, and that the plaintiff's cashier had misappropriated it. Conners recovered from the bank which then sued the defendant on its fidelity bond which was effective from February 24, 1933, to February 24, 1934. This bond proved indemnity for pecuniary loss sustained by the plaintiff as the employer of the cashier for the latter's dishonest conduct. The defendant argued on appeal that the defalcation was not within the coverage of its bond because while it resulted from an act within the coverage, it was not discovered until after the bond had terminated. The court rejected this argument, stating:

> "The policy does not expressly provide that it only shall cover losses discovered during the coverage period. Nor is it susceptible of that construction. The plain meaning of the language is that it covers losses resulting from acts of defalcation of the employe committed during the coverage period. Where, as here, the insurance is to indemnify the insured against loss through the fraudulent and dishonest acts of his employe in connection with the duties of his employment, the insurance covers all losses due to such acts committed during the coverage term, whether discovered during that time or afterwards. [Citations.] We decided *Cary v. National Surety Co.* 190 Minn. 185, 251 N.W. 123 * * * upon [the] assumption that such was the rule." (*State Bank of New Prague*, 206 Minn. 137, 146-47, 288 N.W. 7, 12.)

Moreover, plaintiff and defendant Continental cite two cases which establish that the defendant's bond must be construed to cover the losses sustained as a result of O'Brien's dishonest acts committed during the term of the bond.

In *Employers' Liability Assur. Corp. v. State ex rel. Union Trust Co.* (1941), 110 Ind. App. 86, 34 N.E.2d 936, three officers of the Union Trust Co. were covered by a fidelity bond with personal sureties prior to November 28, 1933, and with Employers' as surety on and after that date. During the period prior to November 28, 1933, the officers had embezzled funds from estates for which the bank was serving as administrator. Some of these embezzlements were "covered" by new misapplications of funds made subsequent to November 28, 1933. The bank brought suit against Employers' claiming that the new misapplications occurring after November 28, 1933, created liability on the bond. The court disagreed, stating:

> "There are two prerequisites for liability on the involved bonds: First, one of the wrongful acts specified in the statute, and second,

a pecuniary loss. *The bond in force at the time of the wrongful act which resulted in the pecuniary loss is the bond liable.* [Citations.] It is the general rule that a fidelity bond is not liable for defalcations which occurred prior to its effective date though they are paid or covered by new defalcations during the effective period of the bond. The reason for the rule is that the original taking was the act which caused the eventual pecuniary loss. [Citations.]

\* \* \*

*It also seems immaterial when the bank actually suffered the pecuniary loss so long as it is clear what acts caused the loss, for the bonds in force at the time of the acts of dishonesty which caused the loss would be liable and not the bond in force at the time the loss was actually suffered."* (Emphasis added.) *Employers' Liability Assur. Corp.*, 110 Ind. App. 86, at 90-92.

In *Mid-City Trust & Savings Bank v. National Surety Co.* (1916), 202 Ill. App. 6 (abstract), the action was on a fidelity bond which agreed to indemnify plaintiff for any loss sustained by reason of any act of forgery by any employee covered by the bond. The bond's coverage terminated as to any employee when that employee left the services of the employer. Nevertheless, the court held that the bond covered four checks forged by an employee while he was still employed by the bank, even though two of those checks were not presented and paid until after the employee had left the bank's employment.

■■ The two foregoing cases support the general rule stated by Couch in his treatise on insurance law that:

"In the case of successive fidelity bonds, the bond in force at the time of the acts of dishonesty which caused the loss applies to cover the loss, and not the bond in force at the time the loss was actually suffered." (13 Couch on Insurance, §46:179 (2d ed. 1965).)

Defendant cites no authority and we have found none to support its argument that the bond under consideration should not be construed in conformance with this general rule.

■■ ■ A bond which is issued by a guaranty company to indemnify against loss from the dishonesty of an employee must be regarded as an insurance contract, and as such is subject to the rules of construction applicable to insurance policies generally. (*United States Fidelity & Guaranty Co. v. First National Bank* (1908), 233 Ill. 475, 481, 84 N.E. 670.) An insurance contract is ambiguous if it is subject to more than one reasonable interpretation. (*State Farm Automobile Insurance Co. v. Pfannebecker* (1978), 64 Ill. App. 3d 582, 585, 381 N.E.2d 796.) We are of the opinion that the absence of an explicit definition of the word "loss" in the bond and General's triple meaning of "loss sustained" indicate that the

bond in question is ambiguous. Therefore, it must be construed most favorably for the insured. (*State Farm Automobile Insurance Co.*) Furthermore, when two constructions of an agreement are arguable and one would lead to an absurd result, the other construction is to be preferred. (*Williamson v. American Insurance Union, Inc.* (1936), 284 Ill. App. 150, 157-58, 1 N.E.2d 541.) In construing a contract as a whole, effect must be given to the intention of the parties, and in arriving at the parties' intention, effect must be given to each word, clause, or term employed by the parties, and none may be rejected for lack of meaning or as surplusage. (*Western & Southern Indemnity Co. v. Industrial Com.* (1937), 366 Ill. 240, 242-43, 8 N.E.2d 644.) Applying these principles to the bond in issue, we note that five other provisions of the bond, discussed below, when construed with the aforementioned provisions establish that the bond was intended to cover the plaintiff's losses.

First, the word "loss" is only defined in terms of causation, *i.e.*, "any loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others." Secondly, paragraph one of Rider No. 10 to the bond provides that:

> "The amount of indemnity on each Employee * * * is hereby increased * * * with respect to loss or losses through fraudulent or dishonest acts committed on and after the 28th day of December, 1965, standard time as specified in the attached bond, and also, in case such amount is decreased by this rider, with respect to loss or losses through fraudulent or dishonest acts committed prior to the last mentioned date and discovered after the expiration of two years from said last mentioned date."

We are of the opinion that since the rider covers a specific time period in which the acts were committed, the bond itself must also be so construed.

Thirdly, under section 4 of the bond, the plaintiff was required to give General notice of the claims "at the earliest practicable moment after discovery of any loss hereunder." Under section 12, General was given the power to terminate the bond upon 30 days' notice. By virtue of these provisions, if General's interpretation of the bond were accepted, General could terminate the bond after receiving notice of the claim before any default, claim, or judgment could occur. On the other hand, if Reserve waited until claims were brought and settled without giving notice so as to avoid triggering possible termination, General could argue that notice was untimely. We do not believe the defendant's interpretation equitably resolves this question.

Fourth, the "loss under prior bond" provision also demonstrates that the term "losses sustained" was used as a summary phrase referring to all acts and events comprising the various risks insured against. Under this

Standard Form 25 bond, a "loss sustained" under a prior bond is recoverable only if "such loss or losses would have been covered" under Form 25 had it been in force "when the acts or omissions or casualty or event causing such loss or losses occurred." We fail to see how Form 25 can be an "act committed" bond in its application to losses under prior bonds without also being an "act committed" bond during its own term.

Finally, "employees" are in part defined in both General's and Continental's bonds as "natural persons in the service of the Insured while employed in, at, or by any of the Insured's offices while covered under this bond during the currency of this bond." Under section 12, the bonds are terminated as to any employee "immediately upon the discovery by the Insured of any dishonest or fraudulent act on the part of such Employee." Since O'Brien was not an "employee" under Continental's bond when he committed the three dishonest acts, and since under section 12 both of the bonds terminated as to O'Brien on December 5, 1968, before any payments were made, if General's construction of the bond were accepted, neither of the bonds would cover the plaintiff's losses. The term "blanket bond" in itself indicates wide coverage. (*Baltimore Bank & Trust Co. v. United States Fidelity & Guaranty Co.* (8th Cir. 1971), 436 F.2d 743, 746.) Contracts of guaranty insurance are made for the purpose of furnishing indemnity to the assured, and they should be liberally construed to accomplish the purpose for which they are made. (*United States Fidelity & Guaranty Co. v. First National Bank* (1908), 233 Ill. 475, 481, 84 N.E. 670.) We cannot accept General's strained construction which would defeat this purpose.

■ For all of the foregoing reasons, we find that General's fidelity bond covered the losses sustained by the plaintiff due to the dishonest acts of its employee committed during the period of that bond. Accordingly, that part of the trial court's order awarding the plaintiff $664,919.59 on the jury's verdict is affirmed.

## II.

However, the trial court erred in awarding prejudgment interest from the date of the payment of each claim in the amount of $245,806.94.

The recovery of prejudgment interest in this state cannot be sustained unless authorized by our statute. (*Harvey v. Hamilton* (1894), 54 Ill. App. 507, 512, *aff'd* (1895), 155 Ill. 377, 40 N.E. 592.) By virtue of section 2 of the Interest Act, prejudgment interest attaches upon (1) "all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; (2) on money lent or advanced for the use of another; (3) on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; (4) on money received to the use of another and retained without the owner's

knowledge; and (5) on money withheld by an unreasonable and vexatious delay of payment." [() supplied.] (Ill. Rev. Stat. 1977, ch. 74, par. 2.) The plaintiff contends that the defendant's fidelity bond covering "any loss through any dishonest or fraudulent act of any of the Employees, committed anywhere * * *" falls within clause one of the statute allowing interest on "all moneys after they become due on any bond * * * or other instrument of writing."

There is authority for the proposition that the term "bond" in the first clause of this statute should not be construed to apply to fidelity bonds which in themselves prescribe no liquidated amount or any specific due date. Thus, in holding that a bid bond did not fall within this clause, the court in *Board of Education v. George S. Walker Plumbing & Heating, Inc.* (1972), 5 Ill. App. 3d 418, 419-20, 282 N.E.2d 268, stated that the statute applied only to " 'written instruments stipulating for the payment of money * * *.' " The courts in *People's Bank & Trust Co. v. Fidelity & Guaranty Co.* (1928), 156 Tenn. 517, 3 S.W.2d 163, and *Genesco, Inc. v. Liberty Mutual Insurance Co.* (M.D. Tenn. 1964), 235 F. Supp. 363, found their statute allowing interest on "all bills singles, bonds, notes, bills of exchange, and liquidated and settled accounts, * * * from the time they become due" inapplicable to fidelity bonds which in general contain collateral conditions and which themselves do not bear interest from a due date. The foregoing cases reflect the attitude of this court expressed in *Hamilton v. American Gage & Machine Corp.* (1976), 35 Ill. App. 3d 845, 853, 342 N.E.2d 758:

> "Each of the categories of bonds, bills and promissory notes specified in the interest statute has the legal attribute of creating an indebtedness. The following general phrase 'or other instrument of writing' should thus be construed under *ejusdem generis* to refer only to other similar writings possessing this same legal attribute and themselves creating an indebtedness. [Citation.]"

Following the rationale of the foregoing cases, it would appear that instruments falling within clause one of the statute must bear a specific due date. This is borne out by several of the cases cited by the plaintiff. For example, those instruments considered in *Heissler v. Stose* (1890), 131 Ill. 393; *Elgin, Joliet & Eastern Ry. Co. v. Northwestern National Bank* (1911), 165 Ill. App. 35; and *In re Morrison* (7th Cir. 1919), 261 F. 355, have been found to have contained a specific due date (see *Weiner v. 222 East Chestnut Street Corp.* (7th Cir. 1962), 303 F.2d 630, 636, *cert. denied* (1962), 371 U.S. 935, 9 L. Ed. 2d 271, 83 S. Ct. 308; see also *Hamilton*). Moreover, insurance contracts have been found to be "instruments of writing" on which money is due and interest allowed where there was within the policy a fixed time for payment (see *DiLeo v. United States Fidelity & Guaranty Co.* (1969), 109 Ill. App. 2d 28, 44-45, 248 N.E.2d 669;

*Peoria Marine & Fire Insurance Co. v. Lewis* (1857), 18 Ill. 553, 562-63), but not where the policy did not expressly provide a specific date when the insurer would be liable for loss (see *Mayfair Construction Co. v. Security Insurance Co.* (1977), 51 Ill. App. 3d 588, 596, 366 N.E.2d 1020; *Bise's Supermarket, Inc. v. Valley Forge Insurance Co.* (1977), 48 Ill. App. 3d 822, 826, 363 N.E.2d 186). Fidelity bonds have been found to be insurance contracts. (*United States Fidelity & Guaranty Co. v. First National Bank* (1908), 233 Ill. 475, 481, 84 N.E. 670.) Thus, it could be argued that in the absence of a specified due date within the bond interest should not attach.

However, the *Weiner* court also noted that in the absence of a specific due date in the instrument itself, interest may nevertheless be allowed in cases in which the subject matter of the underlying obligation carried with it an inherent due date. For example, interest has been allowed from the date of the commencement of the suits on judgments obtained for the breach of construction performance bonds which were conditioned upon prompt payment of amounts due persons supplying labor and materials to the defaulting principals. (See *United States v. Illinois Surety Co.* (7th Cir. 1915), 226 F. 653, *aff'd sub nom. Illinois Surety Co. v. John Davis Co.* (1917), 244 U.S. 376, 61 L. Ed. 1206, 37 S. Ct. 614; *National Surety Co. v. McCormick* (7th Cir. 1920), 268 F. 185; *County of Will v. Woodhill Enterprises, Inc.* (1971), 4 Ill. App. 3d 68, 274 N.E.2d 476.) In light of the need for the continuance of construction upon the principal's default, the surety could be deemed to have given its bond with the knowledge that its liability would accrue upon the date of the principal's default. In *Hamilton Watch Co. v. George W. Borg Corp.* (1942), 317 Ill. App. 271, 46 N.E.2d 112, interest was allowed on a judgment against the purchaser of hairsprings who contracted to reimburse the plaintiff for import fees of $.03 per hairspring when they were delivered (see also *L. W. Foster Sportswear Co. v. Goldblatt Bros. Inc.* (7th Cir. 1966), 356 F. 2d 906 (interest allowed on a judgment for the breach of a written purchase order for goods containing a contract price and a delivery date from 30 days from the date of the last transaction based on the difference between the market and the contract price); *cf. Dempsey-Tegler & Co. v. Irwin* (7th Cir. 1969), 415 F. 2d 1348, 1351 (a confirmation of the purchase of replacement shares was held not to be an "instrument of writing" since there was no underlying purchase agreement specifying a date or due date) with *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 323 N.E.2d 73 (interest allowed on a confirmation of the purchase of securities as an "instrument of writing" noting *Dempsey's* lack of an underlying agreement in comparison)).

Similarly, in *Claude Southern Corp. v. Henry's Drive-In, Inc.* (1964), 51 Ill. App. 2d 289, 201 N.E.2d 127, the defendant's written guarantee

specified payment of $315 per month in the event of the default of its franchisers for the monthly payment for the use of the plaintiff's signs. There the court allowed interest on the judgment against the defendant guarantor from the date each principal defaulted. In cases involving indemnity contracts by which the surety agrees to defend and pay any judgments, the surety also contracts with the knowledge that the specified event, *i.e.*, the entry of judgment, will trigger its liability to pay that judgment. (See, *e.g.*, *Leman v. United States Fidelity and Guaranty Co.* (1907), 137 Ill. App. 258, 266.) Finally, the *Weiner* court also found that the underlying obligation of the bond in *Holmes v. Standard Oil Co.* (1899), 183 Ill. 70, 55 N.E. 647, carried with it an inherent due date. There it was explained that the bond in *Holmes* was conditioned upon the payment of "assessments, liens, judgments and demands * * * that may at any time be levied or come against the premises" and that the liens, judgments, and demands would be "due" before they could "come against the premises."

Turning to the Illinois decisions involving official fidelity bonds collected in Annot., 57 A.L.R.2d 1317-27 (1958), we note that in *Stern v. People* (1882), 102 Ill. 540; *Cassady v. Trustees of Schools* (1882), 105 Ill. 560; *Whittemore v. People* (1907), 227 Ill. 453, 81 N.E. 427; *Town of Cicero v. Hall* (1909), 240 Ill. 160, 88 N.E. 476; and *People v. Lyons* (1912), 168 Ill. App. 396, interest was allowed on judgments obtained on official fidelity bonds arising as a result of the officials' embezzlement of money. However, in *Stern*, the court seemed to rely on clause 2 of the statute, *i.e.*, "on money due on a settlement of account for the day of liquidating accounts between the parties and ascertaining the balance due," insofar as interest was allowed from the end of the official's terms when he balanced the accounts and reported the missing amounts. This was also the method of computation in *Town of Cicero* and in *People v. Pacific Surety Co.* (1910), 155 Ill. App. 586, in which interest on a judgment on an administrator's bond was awarded from the date of the appointment of the new administrator. We are of the opinion that in *Stern, Town of Cicero,* and *Pacific Surety*, the underlying employment contracts requiring a settlement of accounts at the end of the officials' terms specified a due date when, if the account was deficient due to the officials' dishonesty, the liability on the bond accrued and interest began running. However, in *Cassady*, interest was allowed from the date of the conversion of the monies, in *Whittemore*, from the date of service of summons since there had been no prior demand for repayment, and in *Lyons*, from the date of demand for repayment. We find it significant, however, that the bonds in those cases, as well as *Stern* and in *Town of Cicero*, covered public officials who converted monies directly, whereas this case involves an employee fidelity bond covering an employee whose

dishonest act required the contingency of the default on the CCSI bonds. Moreover, although there appears to be some confusion as to whether a good faith defense and dispute as to liability is a factor to be considered and whether this factor may preclude the award of prejudgment interest (*cf., e.g., Central National Chicago Corp. v. Lumbermen's Mutual Casualty Co.* (1977), 45 Ill. App. 3d 401, 359 N.E.2d 797, with *Russell v. Klein* (1977), 46 Ill. App. 3d 660, 361 N.E.2d 65), in none of the foregoing official embezzlement cases was there a dispute as to liability on the bond. The court in *Holmes* relied on by the plaintiff found that the liability of the obligors was plainly and clearly expressed.

■■ In the instant case, the defendant's fidelity bond covering the plaintiff's employees applied to "any loss through any dishonest or fraudulent act of any of the Employees, committed anywhere * * *." It does not by express provision, implication, or by reference to the subject matter of the obligation underlying it, specify when payment thereunder for the loss, if the loss occurs, is to be made nor does it identify any event from or with reference to which the payment is due. The absence of either a specific or an inherent due date arising from the subject matter of the obligation gave rise to the defendant's bona fide defense to its liability on the bond. Under these circumstances, in our opinion, the defendant's obligation to pay did not ripen into an obligation on this bond until the entry of judgment.

■■ It is manifest that the other clauses of the statute are not applicable to the present facts. The remaining statutory phrase pertains to "money withheld by an unreasonable and vexatious delay of payment." This court has held that the mere filing of an appearance and conducting a defense in the litigation does not constitute statutory delay. (*Hamilton*, 35 Ill. App. 3d 845, 853.) Rather, the plaintiff must establish conduct by the opposing litigant "which approximates actual fraud" to come within this statutory language. (*Kespohl v. Northern Trust Co.* (1970), 131 Ill. App. 2d 188, 191, 266 N.E.2d 371.) The record in the instant case lacks proof of fraud, bad faith, or other questionable circumstances in the nonpayment of the claim on the fidelity bond.

For the foregoing reasons, the trial court's order as it pertains to the award of prejudgment interest must be reversed.

### III.

The defendant next contends that numerous evidentiary rulings and the refusal of a jury instruction require reversal of the trial court's judgment for the plaintiff.

### A.

The defendant first argues that evidence of O'Brien's delinquent

reporting to the plaintiff's reinsurance company, of CCSI's irresponsible and unorthodox operation methods, and of the payment of a portion of the excessive premium of the Wierton bond to the person responsible for procuring the excessive premium was irrelevant and therefore improperly admitted by the trial court.

■■ Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768.) The fact in controversy which this evidence was offered to prove was O'Brien's dishonesty. Although mere negligence, mistake, error, or incompetence cannot be characterized as dishonesty, the word "dishonesty" includes an act manifestly unfair to the employer which palpably subjects him to a likelihood of loss, and which indicates a reckless, wilful and wanton disregard for the interest of the employer; and wrongful acts which, although not criminal, nevertheless display significant lack of probity, integrity, or trustworthiness. (*Home Indemnity Co. v. Reynolds & Co.* (1962), 38 Ill. App. 2d 358, 375, 187 N.E.2d 274.) Admission of evidence is a matter largely within the discretion of the trial court, and the trial court will not be reversed unless such discretion has been clearly abused. *Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 365, 366 N.E.2d 327.

■■ Considering the evidence in light of our logic, experience, and assumptions as to human behavior (*Marut*), and in light of the other evidence in the record, we find that it tended to prove O'Brien's reckless, wilful and wanton disregard for Reserve's interests and rendered the fact of O'Brien's dishonesty more probable. Therefore, we cannot say that the trial court clearly abused its discretion in admitting this evidence.

## B.

Plaintiff introduced portions of the evidence deposition of Murray Mehlman, the agent submitting the CCSI bond applications, in which he testified that two days after receiving the premium and fee for the Cascade bond, he sent a portion of that premium to an employee of Reserve named Jack Ryan who had introduced Mehlman to O'Brien and who knew that the construction bonds were not authorized by the plaintiff. The trial court permitted General's counsel to read to the jury a portion of this deposition in which Mehlman testified that the payment was a loan based on personal friendship and that Ryan had died before he could repay it. General then sought to introduce evidence of a second payment from Mehlman to Ryan of $400 made after Ryan had left Reserve which allegedly was made to feed Ryan's children at a time when Ryan was ill. We find that insofar as no testimony respecting this $400 payment was read on direct by Reserve, Reserve's objection to this highly prejudicial matter was properly sustained.

## C.

■■ Finally, General contends that the trial court erred in refusing its jury instruction no. 11A which reads:

> "If you find from your consideration of all of the evidence that the management of Reserve Insurance Company had acquiesced in the issuance of unauthorized contract bonds, there can be no recovery under the fidelity bond issued by the defendant."

Although several of the construction bonds issued by O'Brien appeared on Reserve's books, the Wierton bond was admittedly concealed from Reserve. Thus, we find the trial judge's observation that "the record is final, absolute and clear that there was no acquiescence on the Wierton bond" is well taken and his refusal of this overly broad instruction proper. Moreover, this instruction fails to take into consideration that the plaintiff's acquiescence in the issuance of the bond alone would not preclude recovery since the plaintiff also alleged that O'Brien's failure to obtain reinsurance on the bond constituted a dishonest act covered by the defendant's bond. General was given an opportunity to amend the instruction to exclude the Wierton bond and to state that General had the burden of proving Reserve's acquiescence as an affirmative defense. It declined to do so. Under these circumstances, we are of the opinion that this instruction was properly refused.

The judgment of the circuit court of Cook County is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

PERLIN and HARTMAN, JJ., concur.