AMERICAN TRUST & SAVINGS
BANK, Dubuque, Iowa, Appellee,

v.

UNITED STATES FIDELITY &
GUARANTY COMPANY,
Appellant.

UNITED STATES FIDELITY &
GUARANTY COMPANY,
Third–Party Plaintiff,

v.

O'CONNOR, BROOKS & COMPANY a
Partnership, Third–Party Defendant.

No. 87–28.

Supreme Court of Iowa.

Feb. 17, 1988.

As Corrected Feb. 22, 1988.

Rehearing Denied March 11, 1988.

William C. Fuerste, Allan J. Carew and
Norman J. Wangberg of Fuerste, Carew,
Coyle, Juergens and Sudmeier, P.C., Du-
buque, for appellant.

Francis J. O'Connor, Brendan T. Quann
and Stephen C. Krumpe of O'Connor &
Thomas, P.C., Dubuque, for appellee.

Considered by SCHULTZ, P.J., and
LAVORATO, NEUMAN, SNELL and
ANDREASEN, JJ.

SCHULTZ, Presiding Justice.

The American Trust and Savings Bank,
Dubuque, Iowa (bank) purchased a bank-
er's blanket bond from United States Fidel-
ity and Guaranty Company (insurer). The
bond protected the bank from various spec-
ified losses including those directly result-
ing from dishonest or fraudulent acts of
the bank's employees. The fighting issue
in this case is the extent to which the terms
of the bond require the insurer to reim-
burse the bank by reason of an employee's
embezzlement scheme. The district court

granted summary judgment in favor of the bank in its action to recover under the bond. We hold that the bank was not entitled to summary judgment because the insurer had fulfilled its obligations under the bond. We reverse and remand.

In 1985, Fred Pape, a senior vice-president of the bank, was discovered to have committed a series of embezzlements from the bank commencing in 1969. Pape would obtain money from the bank by forging notes purporting to be loan agreements of bank customers. To conceal his embezzlement he would pay off these notes as they came due, in part with money obtained from newly forged notes. Over this period of time Pape's roll-over scheme involved approximately 496 forged notes. All but twelve of these had been paid off by the time his scheme was discovered. These twelve notes had a face amount totalling $4,305,500.

An audit prepared for the bank showed that of this amount, $2,075,351.64 represented money that Pape had used to make interest payments on the prior fraudulent notes. Bank records show the accrual and payment of interest in that amount. However, the money Pape obtained from the bank in order to pay interest to the bank does not represent an actual depletion of bank funds. The "total cash out" of the bank resulting from Pape's scheme is actually $2,230,148.36. The insurer has already paid this amount less deductible to the bank. The dispute in this case is whether the insurer must also pay the portion of the face amount of the outstanding notes which represents interest paid on prior fraudulent notes. The bank commenced this action against the insurer demanding payment of the portion of the notes attributable to interest. The parties agree on the facts and each sought summary judgment in its favor.

Officers and employees of state-chartered banks are required to provide:

a good and sufficient bond ... indemnifying the state bank against losses, which may be incurred by reason of any act or acts of fraud, dishonesty, forgery, theft, larceny, embezzlement, ... or other unlawful acts committed by such officer or employee ... until all of the officer's or employee's accounts with the state bank shall have been fully settled and satisfied.

Iowa Code § 524.705. In this instance the bank acted for its employees in securing the banker's blanket bond. Although designated a "bond," the banker's blanket bond is in fact a contract of indemnity requiring the insurer, for a premium, to indemnify the bank for certain losses. One risk covered by this contract is, "[l]oss resulting directly from dishonest or fraudulent acts of an [e]mployee...." The parties agree that Pape's defalcation was a covered risk under the terms of the bond, but disagree on the amount of the loss.

Although the insurer argues to the contrary, we conclude that the bond in question is a statutory bond governed by Iowa Code section 524.705. *See State Surety Co. v. Lensing,* 249 N.W.2d 608, 611 (Iowa 1977); *Community Savings Bank v. Western Surety Co.,* 232 Iowa 1381, 1385, 8 N.W.2d 427, 429 (1943). In establishing the insurer's liability, we must examine the statute as well as the terms of the bond itself. The coverage required by the statute will be read into the bond. *See State Surety Co.,* 249 N.W.2d at 611. A statutory bond will be liberally construed in light of the purpose for which it was required, however, it will not be extended by implication beyond the clearly expressed intent of the statute. *See* 11 C.J.S. *Bonds* § 39 (1938). That is not to say that bonds may not provide coverage beyond the requirements of the statute. With these principles in mind we turn to examine the extent of coverage under the bond.

Both the statute and the bond itself speak of "losses", the key word in this dispute. The statute requires that the bond indemnify the bank against "losses" resulting from various acts of the bank officer or employee, including embezzlement and forgery, "until all of the officer's or employee's accounts with the state bank shall have been fully settled and satisfied." Iowa Code § 524.705. The bond provides indemnity for "[l]oss resulting directly

from dishonest or fraudulent acts of an [e]mployee." Although language in the statute and bond contains similarities with no appreciable differences, we believe that in defining "loss" we must first emphasize the language in the statute. If the bond provides more coverage than the statute requires, this additional coverage would be for the benefit of the bank.

The insurer insists that the court was wrong in concluding that the loss is determined from the face of the fictitious notes created by Pape rather than by the actual depletion of the bank's funds. The bank maintains that Pape is liable to the bank for the face amount of the twelve outstanding notes, *see* Iowa Code § 554.3404(1) (one who signs name of another, without authorization, is liable on note). It then claims that the bonding company's liability is co-extensive with that of the defalcating employee.

We believe that the terms "losses" under the statute and "loss" under the bond refer to the actual depletion of bank funds caused by the employee's dishonest acts and not to the eventual personal liability of the employee to the bank. Stated otherwise, the covered loss is that which arises at the time and place that the specified misconduct occurred. *Citizen's Bank of Oregon v. American Ins. Co.*, 289 F.Supp. 211, 214 (D.Ore.1968). A number of cases involving coverage questions based on the issue concerning the time of the loss support this position. The Massachusetts Supreme Court has stated,

> In this bond the word "loss" means the deprivation or dispossession of money or property of the bank due to the dishonest, criminal or fraudulent acts of its officers, regardless of the security the bank has for the loss, and that the "loss" occurred and was suffered by the plaintiff, without regard to its possible remedies, when its funds in fact were diverted ... through the fraud and dishonesty of its treasurer.

*Fitchburg Savings Bank v. Massachusetts Bonding & Ins. Co.*, 274 Mass. 135, 149–50, 174 N.E. 324, 328 (1931). Dealing with the same problem another court stated "that

the original taking was the act which caused the eventual pecuniary loss." *Employer's Liability Assur. Corp. v. State*, 110 Ind.App. 86, 91, 34 N.E.2d 936, 937 (1941).

In passing on a scheme similar to Pape's, where new money was diverted to pay off and conceal prior diversions, a federal district court addressed the issue of which of two successive insurance policies covered the loss. *See John B. White Inc. v. Providence Washington Ins. Co.*, 329 F.Supp. 300 (E.D.Pa.1971). The court rejected a claim that the first company was exonerated from liability because embezzlements which occurred while its policy was in effect were paid off by subsequent embezzlements. The court stated that such a claim:

> overlooks the admitted fact that these funds were used to cover previous shortages in other customer accounts as well as the fact that the embezzlement was continuing, and, as the calculations show, waxing during the period of the Prov–Wash Policy.

*Id.* at 330. While these cases address a different issue, we find them instructive. We believe that the covered loss under the bond and statute at issue is that which occurs at the time of the original wrongdoing. Thus, "loss" does not include that portion of the outstanding notes which represents interest payments made to cover up prior embezzlements.

■ The next question is whether Iowa Code section 524.705 requires the insurer to indemnify the bank beyond its loss. The bank points to the statutory language requiring the bond to indemnify "the state bank against losses ... until all of the officer's or employee's accounts with the state bank shall have been fully settled and satisfied." The bank urges that this language makes the insurer's liability under the bond co-extensive with Pape's. It further argues that the funds Pape fraudulently obtained to pay interest on prior notes affected the bank's balance sheets, lending limits, and reserves to the same extent as the funds Pape used to pay the principle on the prior notes or for his own purposes. They also point out they have

paid income tax on this interest. We do not agree with the bank's interpretation of section 524.705.

Even assuming that Pape was liable for the face amount of the twelve notes outstanding at the time he was discovered, we believe that the coverage required under section 524.705 is for loss caused by the specified acts. The required coverage should not be extended to cover interest that accumulated on the forged instruments. When newly forged notes were used to pay interest, the bank suffered no loss because its assets were not diminished in fact, nor did the phony interest payments increase the bank's assets, although its books showed otherwise. The payment of income tax on the theoretical gain did not result from the defalcation, rather it was a consequence of Pape's subsequent cover-up of the prior embezzlements. Thus, this alleged loss was not a loss from the specified acts.

We believe that our interpretation of "losses" under section 524.705 is equally applicable to the terms of the bond. The bond specifically covers loss resulting directly from the specified dishonest acts. Losses resulting from failure to repay real or legitimate notes are expressly excluded in the policy. If Pape is liable to the bank for the face amount of the twelve notes it is because of his signatures on them. We believe that this bad loan exclusion would prevent the insurer from being liable for Pape's civil liability beyond his actual defalcation.

We acknowledge that our holding in this case is contrary to authority cited by the bank. *See St. Paul Fire & Marine Ins. Co. v. Branch Bank & Trust Co.*, 834 F.2d 416 (4th Cir.1987); *Bank of Huntingdon v. Smothers*, 626 S.W.2d 267 (Tenn.Ct.App. 1981). However, we do not feel compelled to follow those decisions. The Tennessee Court of Appeals was the first court to address this issue in *Bank of Huntingdon*, and the Fourth Circuit found its reasoning persuasive. In defining the loss under the bond, these cases emphasize the eventual liability of the employee and the inapplicability of exclusions. They do not directly address the insurer's agreement to only indemnify the bank for losses caused by specified acts of the employee. While we have given those cases proper consideration we do not believe they present a proper resolution of this issue.

In construing Iowa Code section 524.705 and the banker's blanket bond as we have, we are not unmindful of the result had we adopted the bank's interpretation. If we were to allow recovery of the full face amount of the twelve outstanding notes the bank would in fact profit from the dishonest acts of its own employee. Such an interpretation of the statute and the bond would be unreasonable.

■ We believe that the insurer rather than the bank was entitled to summary judgment, but that the insurer's judgment should be limited. The insurer claims that it should not be required to pay any interest on the stolen funds. We disagree. We have previously stated, "Up to the face of a private bond the surety is liable for interest the same as the principal." *Mechanicsville Trust & Savings Bank v. Hawkeye–Security Ins. Co.*, 158 N.W.2d 89, 93 (Iowa 1968). In *Mechanicsville Trust & Savings Bank* we held the surety responsible for interest from the date of each embezzlement, as calculated under Iowa Code section 535.2.

We hold that the bank is entitled to the interest specified in section 535.2(1) from the date of each defalcation until the date this action was commenced. From the date the action was commenced the bank is entitled to the interest under Iowa Code section 535.3.

We remand this matter for a determination of the amount of interest owed the bank.

REVERSED AND REMANDED.